HOLT *et al. v.* PARSONS *et al.*, commissioners, *et al.*

1. A party is not entitled to an injunction when, with full knowledge of his rights, he has been guilty of delay and laches in asserting them, and has negligently suffered large expenditures to be made by another party on whom great injury would be inflicted by the grant of the injunction.
2. A mere threat to take legal proceedings is not sufficient to prevent the application of this rule.

Argued October 21, — Decided November 3, 1903.

Petition for injunction. Before Judge Roberts. Wilcox superior court. September 4, 1903.

*D. B. Nicholson* and *Crum & Jones*, for plaintiffs.

*J. L. Bankston* and *M. B. Cannon*, for defendants.

SIMMONS, C. J. It appears from the record that there has been a controversy in Wilcox county for several years as to the location of the county court-house. Several elections have been held to determine the question, and there has been much litigation in the courts and controversy in the legislature. In October, 1902, this issue was made in the election of the commissioners of roads and revenues. That election resulted in the election of commissioners a majority of whom had declared themselves in favor of the erection of a new court-house at Abbeville. In February, 1903, the board of commissioners of roads and revenues met and passed an order condemning the old court-house as unsuitable for a court-house and unsafe for the preservation of the records of the county. The board also ordered that an architect be employed to submit plans for a new court-house to cost not more than $50,000. In pursuance of this order an architect was employed, and he submitted plans to the board. On March 2, these plans were accepted by the board, which ordered that advertisement be made calling for bids for the erection of the new building in accordance with the plans which had been accepted. This advertisement described the building to be erected, stated the number of stories, the size and materials of the building, and the number and location of the various rooms to be contained therein. All of these orders were placed on the minutes of the board, and were subject to inspection by the citizens of the county. In reply to the advertisement three bids were made, and that of J. H. McKenzie & Sons, undertaking to erect the building for $49,380, being the lowest and best bid, was accepted. On the same day, May 4, McKenzie & Sons en-

tered into a contract with the board, by which they bound themselves to erect the court-house by June 1, 1904. The order of the board required the contractors to give bond and security in double the amount of the bid. On May 8, Nicholson, an attorney at law, wrote the contractors a letter. This letter does not appear in the record but the reply of the contractors does. In their reply they acknowledged receipt of Nicholson's letter, and noted that he would use all legal means to enjoin the work. Whether, in writing this letter, Nicholson represented the present plaintiffs in error or himself, the record does not disclose. The contractors proceeded with the performance of their contract, by purchasing materials for the building to the amount of more than $24,000, and expending more than $5,000 for work and labor, the total expenditure amounting to a little more than $30,000. On August 3, 1903, the board of commissioners of roads and revenues met and assessed the county taxes for ordinary and extraordinary purposes. Among the latter it levied a tax of $30.86 per $1,000, to be collected in 1903, to pay the contractors the contract price for the erection of the new court-house. On August 20 thereafter, the plaintiffs in error presented their equitable petition to the presiding judge of the superior court of the circuit, seeking to enjoin the collection of this tax, on the ground that it was unnecessary, exorbitant, and excessive. Many affidavits from the citizens and taxpayers of the county were filed and read before the judge, as to whether the tax was unnecessary and excessive in amount; but the view we take of the case renders it unnecessary to discuss this question. The answer of the board of commissioners of roads and revenues and its codefendants, the tax-collector and the contractors, distinctly raised the point that the petitioners were not entitled to an injunction, because by their conduct they had permitted the contract to be made and had permitted the contractors to expend large sums of money in the performance of the contract, and that petitioners, by reason of their delay and laches, were not entitled to any equitable relief. It was stated in the argument of counsel for both sides that the learned judge who tried the case denied the injunction on this ground, though the reason for his decision is not shown by the record. Whether he did so or not does not matter, as his judgment will be affirmed by this court if it is correct in any view of the case.

We have given a great deal of consideration to the case, on account of the fact that the tax is apparently a very large one to levy upon the taxpayers in one year, but after a full investigation we have come to the conclusion, upon principle and authority, that the judgment of the court below was right.    Equity favors the vigilant, and does not extend its aid to the negligent or the sleepy. It will not stay the erection of a public building at the instance of parties who through remissness or indolence have slept over their rights until after another has expended large sums of money in the erection of the building.    The petitioners were remiss in not having earlier sought to assert whatever rights they might have had in the premises.    As before stated, the controversy as to the location of the court-house had existed in that county for several years.    The majority of the commissioners were elected with a view to erecting a new court-house at Abbeville, which has been the county seat since the county was organized.    A month after their election and induction into office, these commissioners took the first step toward the erection of a new court-house, by condemning the old as unsuitable and unfit.    They employed an architect to submit plans for the new court-house, stipulating that the building should cost not more than $50,000.    The architect furnished the plans, and they were accepted.    Advertisements for bids from contractors, giving a full description of the building and the materials of which it was to be constructed, were published in the county newspapers.    These bids were to be submitted on May 4.    All of the orders of the board were entered upon the minutes and published in the county newspaper in which the sheriff's advertisements were made.    The public was therefore aware of the preparations to build the new court-house and the amount it would cost.    No protest was filed on the day the bid of McKenzie & Sons was accepted, though a large number of taxpayers were present.    No notice was given on that day of any intended proceedings.    The only notice which appears ever to have been given was the letter of an attorney to the contractors, after the contract had been entered into, that he would use all legal means " to enjoin the work."    Of this we will speak later.    The facts show, we think, that the taxpayers and the public were put upon full notice of the intention of the commissioners to build this court-house.    The record further discloses that there was no money in the county

treasury which might be applied to this purpose. This it seems the public knew. They must therefore have known that it was necessary to levy a tax to pay for the building, and that this must be done in one year, as the commissioners have, under the constitution, no authority to create a debt against the county for this purpose. For at least three months before there was even a threat of legal proceedings, the taxpayers and the public had notice of the intention of the commissioners to expend this money. If the contract advertised for was illegal, or if the order employing the architect and specifying the cost of the building was such that an excessive tax was necessary to carry it out, the taxpayers knew this, and had a right at any time before the contract was made, or probably before any money was expended under it by the contractors, to commence proceedings to enjoin the work. Not however until after the contract had been made, and after large sums had been expended by the contractors in carrying it out, were any steps taken to stop it. Under the facts recited, it was not at all necessary for the petitioners to wait until the tax was levied on August 3, 1903. *Hudson* v. *Marietta, 64 Ga.* 286; *County of Dougherty* v. *Boyt,* 71 *Ga.* 484; *Gavin* v. *Atlanta,* 86 *Ga.* 132. These cases show that a taxpayer may enjoin the making of an illegal contract, and for this purpose may file his petition before the contract is entered into by the public authorities.

On the main question of equitable estoppel because of laches, the principle laid down in the first headnote is supported by many authorities. In *Irvin* v. *Gregory,* 86 *Ga.* 605, it appeared that an election had been held to establish a public school, and that in pursuance of the election expenses had been incurred and the school had been in operation about six weeks when certain taxpayers filed a petition to enjoin the collection of a tax imposed in pursuance of the election. This court held that, regardless of the merit of the grounds on which they relied, the petitioners were too late. In *Wood* v. *Railroad Co.,* 68 *Ga.* 539, it appeared that the railroad company had obtained a right of way through a public cemetery of the city of Macon. It had bought other lands to be used in extending this right of way, and had expended large sums of money and had done considerable work, when Wood filed his petition to enjoin it. This court denied the right of Wood to equitable relief, because of his long delay, and Jackson, C. J., said:

" The principle that to the vigilant, and not to the sleepy, equity opens her portals, is applicable here, and applies with sufficient force always to close her doors when by reason of that sleep the adverse party has expended money and labor, thinking that nobody interested would oppose the right to complete what had been commenced in the confidence which non-action by everybody interested had engendered." See also *Dulin* v. *Caldwell*, 28 *Ga.* 117; *Southern Marble Co.* v. *Darnell*, 94 *Ga.* 231; 1 High, Inj. (3d ed.) §§ 549, 618; 16 A. & E. Enc. Law (2d ed.) 356; Pomeroy, Eq. Jur. (2d ed.) §§ 817, 965. It was argued that the contractors made their expenditures after they had received the letter from the attorney that he would use all legal means to enjoin the work, and that they therefore made the expenditures at their peril. We think that this threat, thus communicated, amounted to nothing. Conceding that the erection of the Wilcox county courthouse was the "work" referred to, still the letter was received after the contractors had deposited $3,000, binding themselves to enter into the contract if their bid was accepted, and had actually entered into the contract, and had probably, though the record does not show positively, made the bond required. Thus the notice was itself too late. In the second place, "a mere objection or protest, or a mere threat to take legal proceedings, is not sufficient to exclude the consequences of laches or acquiescence." Easton & McMahon *v.* Railroad Co., 24 N. J. Eq. 50; 16 A. & E. Enc. Law (2d ed.) 357. This is especially true in a case like the present, where it appears that no legal proceedings were commenced until more than three months after the notice was given. The contractors might well have thought, even on June 1, when work was commenced, that the threat was an idle one, or that the intention to resort to the courts had been abandoned. If a notice of this character could ever be effectual, it will not be so held in a case where it was given on May 8 and was not followed up by legal proceedings until August 20.

For the reasons given, the judgment of the court below must be affirmed. While the tax seems to be quite large, and the affidavits indicate that suffering will ensue to the people of the county if they are compelled to pay it, and while we would be glad to relieve them if it were in our power, we can not do so without violating the well-known principles which we have above announced.

When the law is plain, it must be administered without regard to the hardships which may arise from its enforcement.     When a court undertakes to decide the law so as to prevent hardship to one of the parties, it usually sets bad precedents which tend to confuse future decisions.     In the present case a decision either way would entail a hardship on some one.     Either the plaintiffs in error must suffer from the enforcement of a very large tax assessment, or else the contractors must lose all that they have expended in the performance of their contract.     In such a case, equity must have regard to the respective diligence of the parties, and will not relieve one whose negligence and delay has placed it beyond the power of the court to extend him aid except at the expense of one who has been diligent.     To do so would be unjust and inequitable, and would violate one of the cardinal principles of equity jurisprudence, that  equity aids the vigilant, not the slothful.          *Judgment affirmed.   All the Justices concur.*